IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | |
|---|---|
| H.H FRANCHISING SYSTEMS, INC., | Case No. 1:21-cv-575 |
| Plaintiff, | Judge Matthew W. McFarland |
| v. | |
| CARESMART SOLUTIONS, INC., et. al., | |
| Defendants. | |

### ORDER GRANTING
### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Doc. 17)
### AND ISSUING A PRELIMINARY INJUNCTION

This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction (Doc. 17). Defendants filed a response in opposition to the Motion (Doc. 23). The Court then held a preliminary injunction hearing on March 30, 2022. Following such hearing, Plaintiff filed a supplemental brief in support of its Motion (Doc. 27), to which Defendants responded (Doc. 30), and Plaintiff replied (Doc. 31). Thus, the Motion is fully briefed and ripe for review. As explained below, Plaintiff's Motion for a Preliminary Injunction is **GRANTED**.

### BACKGROUND

Plaintiff H.H. Franchising System, Inc. ("HHFS") is the national franchisor of the Home Helpers brand of franchised businesses offering in-home care services. (Transcript, Doc. 25, Pg. ID 231-232.) The customer segments for HHFS franchisees are seniors, new

mothers and families, those rehabbing from injury and illness, and those living with lifelong illness, including those with developmental disabilities. (*Id.* at 232.) Specifically, "HHFS provides the tools of resources, the intellectual property, the proprietary system . . . , the know-how to use those in garnering business with companionship, personal care, [and] medical services" to its franchisees. (*Id.* at 234.) There are approximately two-hundred Home Helpers franchisees. (*Id.* at 248.)

Defendant CareSmart Solutions, Inc. ("CareSmart") has been a HHFS franchisee since 2005 in Blair County, Pennsylvania. (Transcript, Doc. 25, Pg. ID 295.) Originally, CareSmart was under different ownership. (*Id.*) Then, in 2011, Defendant Lynn Gardini became the sole shareholder of CareSmart. (*Id.*) Following Gardini becoming the sole shareholder, CareSmart signed the Franchise Agreement at issue in this case. (*Id.*) Gardini personally guaranteed the Franchise Agreement, thereby agreeing "to be personally bound by, and personally liable for the breach of, each and every provision of the [F]ranchise [A]greement, including the noncompetition covenant." (Nelson Decl., Doc. 17-3, Pg. ID 89; *see also* Personal Guaranty, Doc. 17-3, Pg. ID 153.) She also signed a Restrictive Covenant Agreement on her own behalf. (Restrictive Covenant Agreement, Doc. 17-3, Pg. ID 155-57.) The Franchise Agreement and Restrictive Covenant Agreement are only binding on Defendants, not all employees of defendants. (Transcript, Doc. 35, Pg. ID 334.)

Gardini testified that there are a number of competitors in the Blair County in-home care market. (Transcript, Doc. 25, Pg. ID 404.) She testified that there are approximately 11 other in-home care agencies in the market. (*Id.* at 346-47.) Additionally,

2

many of these competitors, like Defendants, provide services for Medicaid, Office of Aging, and Veterans Association payers like Defendants. (*Id.* at 405.) Also, due to the need of in-home caregivers in the Blair County market, in-home caregivers currently employed by Defendants would be able to find additional work. (*Id.* at 334.)

The Franchise Agreement provides that CareSmart, as a franchisee, shall "operate a home care aid, personal care aid assistance, companion care, and ancillary medical service business . . . using [HHFS's] System" within a specific territory. (Franchise Agreement, Doc. 17-3, Pg. Id 99-100.) CareSmart's territory was certain postal zip codes in and around Blair County, Pennsylvania. (Nelson Decl., Doc. 17-2, Pg. ID 89.) CareSmart was also provided "a non-exclusive license to use solely" the marks and systems of HHFS. (Franchise Agreement, Doc. 17-3, Pg. ID 99.) In exchange, CareSmart was required to (1) pay a one-time franchise fee and (2) provide HHFS royalty payments based on a percentage of CareSmart's gross revenues. (*Id.* 104-05.) The Franchise Agreement provided for a term of ten years. (*Id.* at 101.) At the conclusion of the ten-year term, CareSmart, at its option, could renew the licenses granted under the Franchise Agreement for two additional, consecutive terms. (*Id.*)

The Franchise Agreement contains multiple obligations upon termination. (Franchise Agreement, Doc. 17-3, Pg. ID 136.) Of relevant note, the Franchise Agreement states:

> Upon the termination or expiration of this Agreement for any reason, Franchisee shall forthwith . . . [p]romptly notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use the telephone numbers and directory listings used in connection with the franchised business and authorize the transfer of the telephone numbers

3

and directory listings to [HHFS] or its designee.

(*Id.* at 137.)

Additionally, the Franchise Agreement contains a non-compete covenant, mandating that CareSmart, for a two-year term following the termination of the Franchise Agreement, cannot:

> own, maintain, operate, engage in, or have any interest in any business offering home care aide, home maker, personal care aide assistance, companion services, medical services or any other services that had been offered by the franchised business, that is or is intended to be located or which operations in or within 15 miles of the geographical boundaries of [CareSmart's] Territory . . .

(Franchise Agreement, Doc. 17-3, Pg. ID 139.)

As the personal guarantor of the Franchise Agreement, Gardini also signed the Restrictive Covenant Agreement. (*See* Restrictive Covenant Agreement, Doc. 17-3.) Gardini testified that she reviewed and signed the Franchise Agreement and Restrictive Covenant Agreement in October of 2011. (Transcript, Doc. 25, Pg. ID 397-98.) A non-compete covenant was also included in the Restrictive Covenant Agreement, which states:

> [Gardini] covenants that, . . . for a continuous and uninterrupted period commencing upon the expiration or termination of the Franchise Agreement . . . and continuing for two (2) years thereafter, directly or indirectly, . . . [she shall not] own, maintain, operate, engage in, or have any interest in, any business offering care aid assistance, home maker, companion care services and ancillary medical services, and personal emergency response products or services or other products or services that had been offered by [CareSmart], which is or is intended to be located within [CareSmart's] Territory . . .

(Restrictive Covenant Agreement, Doc. 17-3, Pg. ID 156.)

The Franchise Agreement term ended on October 10, 2021 and CareSmart elected

4

not to renew the Franchise Agreement. (Notice of Nonrenewal, Doc. 27-2, Pg. ID 565.) Despite this, Defendants have continued to operate within the territory and offer the same services to customers as Defendants did when they were a HHFS franchise. (Dickison Decl., Doc. 17-2, Pg. ID 81.) According to HHFS executives, Defendants have failed to comply with the post-termination obligations listed above. (Nelson Decl., Doc. 17-3, Pg. ID 93.) In fact, HHFS had a private investigator verify that Defendants are continuing to operate in violation of the post-termination obligations. (Alkhdour Decl., Doc. 17-4, Pg. ID 170-71.) Gardini herself testified that CareSmart continues to service all customers it serviced as a HHFS franchise despite such conduct being in violation of the Franchise Agreement and the Restrictive Covenant Agreement. (Transcript, Doc. 25, Pg. ID 406.)

HHFS brought this action on September 3, 2021, seeking declaratory judgment disallowing CareSmart from continuing to operate in the territory following the Franchise Agreement's expiration. (Compl., Doc. 1, Pg. ID 7-8.) Following the Franchise Agreement's expiration, HHFS filed an Amended Complaint on November 30, 2021, alleging that Defendants breached the Franchise Agreement and Restrictive Covenant Agreement by violating the post-termination obligations outlined above. (*See* Am. Compl., Doc. 6.) Then, on January 3, 2022, HHFS moved for a preliminary injunction. (*See* Motion, Doc. 17.)

## LAW

Federal Rule of Civil Procedure 65(a) allows the Court to issue a preliminary injunction against an adverse party. Fed. R. Civ. P. 65(a). "The purpose of

5

a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* "A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id.* (internal citation omitted).

In determining whether to impose a preliminary injunction, this Court is required to consider four factors: "(1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). These four factors are "to be balanced and not prerequisites that must be satisfied." *Id.* "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success on the merits." *Id.*

## ANALYSIS

### I. Likelihood of Success on the Merits

First, HHFS argues that it has established a likelihood of success on the merits of its breach of contract claim due to Defendants' alleged breach of the Franchise Agreement

6

and Restrictive Covenant Agreement by violating the non-compete covenants. Additionally, HHFS argues that Defendants violated the Franchise Agreement by failing to transfer the telephone numbers associated with the franchise to HHFS upon termination of the Franchise Agreement. The non-compete covenants and Defendants' obligation to transfer telephone numbers associated with the franchise upon termination of the Franchise Agreement are governed by Ohio law.[1] Each argument is discussed in turn below.

### a. The Non-Compete Covenants

To establish a breach of contract claim under Ohio law, a plaintiff must show that (1) a contract existed, (2) the plaintiff performed its obligations under the contract, (3) the defendant breached the contract, and (4) plaintiff suffered damages. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006). Here, the only issue in dispute is whether the non-compete covenants are reasonable and, thus, enforceable.

A covenant against competition is enforceable if it seeks to protect a legitimate business interest and is reasonable. *Matco Tools Corp. v. Urquhart*, 435 F.Supp.3d 802, 809 (N.D. Ohio 2020). "Under Ohio law, a non-compete covenant is reasonable if it (1) is no greater than is required for the protection of the employer[,] (2) does not impose undue

---

[1] The Franchise Agreement states that "the laws of the State of Ohio . . . govern all aspects of this agreement . . . provided, however, that if any of the covenants contained in Article 15 of this Agreement would not be enforceable under the laws of Ohio and the franchised business is located outside of Ohio, then such covenants shall be interpreted and construed under the laws of the state in which the franchised business is located." (Franchise Agreement, Doc. 17-3, Pg. ID 144.) The non-compete covenant of the Franchise Agreement is within Article 15. (*See* Franchise Agreement, Doc. 17-3, Pg. ID 130-40.) Because the Court finds such the non-compete covenants to be enforceable, Ohio law applies. Additionally, Defendants' obligation to transfer telephone numbers back to HHFS upon termination of the Franchise Agreement is within Article 14 and, thus, also governed by Ohio law.

7

hardship on the employee, and (3) is not injurious to the public." *Handel's Enter., Inc. v. Schulenburg*, 765 F. App'x. 117, 123 (6th Cir. 2019). Courts apply the same three-part test when determining the reasonableness of a non-compete covenant within a franchise agreement. *Id.* at 124. A party must establish each element by clear and convincing evidence. *Id.* at 123-24. Whether a non-compete is reasonable "is determined on a case-by-case basis." *Id.* (quoting *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 526 (6th Cir. 2013)).

First, the non-compete covenants in the Franchise Agreement and Restrictive Covenant Agreement seek to protect a legitimate business interest. This Court has found "loss of control of reputation, loss of goodwill, and consumer confusion" to all be considered legitimate "and frequently recognized" business interests. *Dealer Specialties, Inc. v. Car Data 24/7, Inc.*, No. 1:15-cv-170, 2016 WL 5341797, *6 (S.D. Ohio Sept. 23, 2016). Here, like in *Deal Specialties, Inc.*, "Defendants had exposure to and training involving [HHFS's] trade secrets and business model," and used such exposure to directly compete with HHFS despite the non-compete covenant. *Id.* Such competition would "inevitably result[] in consumer confusion and leaves [HHFS's] goodwill, tradename, reputation, prospective business opportunities, and proprietary information open to significant harm." *Id.* Thus, the Court finds that the non-compete covenants seek to protect a legitimate business interest.

Next, because the non-compete covenants seek to protect legitimate business interests, the Court must determine if they are reasonable. First, the non-compete covenants are not greater than required for HHFS's protection. This Court, as well as

8

other courts applying Ohio law, have held that non-compete covenants within a franchise agreement with a two-year temporal restriction are reasonable. *See Petland, Inc. v. Hendrix*, No. 2:04CV224, 2004 WL 3406089 (S.D. Ohio Sept. 14, 2004); *see also Dealer Specialties, Inc.*, 2016 WL 5341797; *Stoner v. Salon Lofts, LLC*, No. 11AP-838, 2012 WL 2928671 (Ohio Ct. App. Jul. 19, 2012). Additionally, multiple courts applying Ohio law have found geographical limitations over fifteen miles to be reasonable. *See Economou v. Physicians Weight Loss Ctr. of Am.*, 756 F.Supp. 1024 (N.D. Ohio 1991) (finding a geographical limitation of fifty miles to be reasonable); *see also Dealer Specialties, Inc.*, 2016 WL 5341797 (finding a geographical limitation of twenty miles to be reasonable). Lastly, both this Court and the Sixth Circuit have held that "boilerplate language," such as the language within the non-compete covenants here, are reasonable in nature. *See Handel's Enter., Inc.*, 765 F. App'x 117; *see also Dealer Specialties, Inc.*, 2016 WL 5341797. Therefore, because the temporal limitations, geographical limitations, and scope of the non-compete covenants are reasonable, the non-compete covenants are no greater than is required for the protection of HHFS.

Also, the non-compete covenants do not impose undue hardship on Defendants. First, due to the reasonable nature of the temporal and geographical limitations, Defendants may use any skills and experience in other markets and, after the two-year time period has expired, return to Blair County, Pennsylvania. Additionally, as discussed in greater detail below, any hardship or harm Defendants would face would be primarily self-inflicted. This Court has held that self-inflicted hardship is not considered "undue hardship" when considering the reasonableness of a non-compete covenant. *Petland, Inc.*,

9

2004 WL 3406089 at *3. Thus, the non-compete covenants do not impose undue hardship on Defendants.

The non-compete covenants are not injurious to the public. As explained in more detail below, the vulnerable clients that Defendants serve will continue to be served. Gardini testified that there are approximately 11 other in-home care agencies in the Blair County market. (*Id.* at 346-47.) Additionally, many of these competitors provide services for Medicaid, Office of Aging, and Veterans Association payers like Defendants. (*Id.* at 405.) Additionally, in-home caregivers currently employed by Defendants would still be able to provide the same services in the market, as the non-compete covenants are only enforceable against Defendants. (*Id.* at 334.) Thus, enforcement of the non-compete covenants would not be injurious to the public.

In summary, HHFS has established by clear and convincing evidence that the non-compete covenants are seeking to protect a legitimate business interest and are reasonable. Thus, the Court finds that HHFS has established a likelihood of success on the merits on its breach of contract claim.

### b. Transfer of Telephone Numbers Associated with Franchise

HHFS argues within its Motion that it has established a likelihood of success "on its claim that [Defendants] have breached their obligations to transfer telephone numbers associated with the former franchise to HHFS." (Motion for Preliminary Injunction, Doc. 17-1, Pg. ID 72.) Defendants do not address this argument in their response in opposition. Additionally, neither party address this claim in the post-hearing briefing. The Franchise Agreement states that Defendants were to "[p]romptly notify the telephone company and

10

all listing agencies of the termination or expiration of the [Defendants'] right to use the telephone number and directory listing used in connection with the franchised business and authorize the transfer of the telephone numbers and directory listing to [HFFS] . . ." (Franchise Agreement, Doc. 17-3, Pg. ID 137.) Ohio courts have found such obligations to be enforceable. *See Gioninio's Pizzeria Inc. v. Reynolds*, No. 20 CA0940, 2021 WL 1405640 (Ohio Ct. App. Mar. 31, 2021).

Thus, the Court finds that HHFS has established a likelihood of success on the merits on its breach of contract claim because Defendants' have breached the Franchise Agreement by failing to transfer telephone numbers associated with the franchise to HHFS following termination of the Franchise Agreement.

For the aforementioned reasons, the likelihood of success on the merits factor weighs in favor of issuing a preliminary injunction.

## II.   Irreparable Harm

Next, "[a]fter determining that a plaintiff has demonstrated a substantial likelihood of success on the merits of [its] claim, the second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 550 (6th Cir. 2007). Thus, if monetary damages are difficult to calculate, then "the injury is not fully compensable by monetary damages." *Id.*

11

HHFS cites multiple harms it will suffer that are not fully compensable by monetary damages. Such harms include, but are not limited, to loss of goodwill, loss of customers, and inability to refranchise the territory. (HHFS Post-Hearing Brief, Doc. 27, Pg. ID 431-32.) HHFS executive Emma Dickison testified regarding the purpose of the non-compete covenants, stating:

> The noncompete agreement is used to protect the goodwill of the marks that's been built overtime. It is used to protect the relationship of the clients and the referral sources and the consumer to the brand. It's designed to make sure that someone who has had the know-how and has utilized that experience in the system those years aren't using it against you as you try to refranchise the territory.

(Transcript, Doc. 25, Pg. ID 243.)

The harms that Dickison outlined are the exact type of injuries that cannot be fully compensable by monetary damages. "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Basicomputer Corp. v. Scott*, 973 F.3d 507, 512 (6th Cir. 1992). The Sixth Circuit has determined on multiple occasions that the exact harm the non-compete covenants are meant to protect HHFS against is irreparable. *See Certified Restoration Dry Cleaning Network*, 511 F.3d at 550 (finding likely interference with customer relationships constitutes irreparable harm); *see also Handel's Enter., Inc.*, 765 F. App'x at 125 (holding that "a strong risk of market confusion, along with the loss of fair competition and customer goodwill from existing and prospective customers" constitutes irreparable harm).

Thus, HHFS would suffer irreparable harm without a preliminary injunction. The second factor also weighs in favor of issuing a preliminary injunction.

### III. Substantial Harm to Others

The third factor the Court must consider "is whether the issuance of the injunction would cause substantial harm to others." *Handel's Enter., Inc.*, 765 F. App'x 117 at 124. Within Defendants' original response in opposition and their post-hearing brief, Defendants argue that a preliminary injunction would disproportionally harm Defendants because "an injunctive order would cause the certain and immediate loss of fifty-percent of [Defendants'] business." (Response in Opposition, Doc. 23, Pg. ID 216; *see also* Defendants' Post-Hearing Response in Opposition, Doc. 30, Pg. ID 619.) While the Court is sensitive to Defendants' position, Defendants' harm is self-inflicted. When the harm to a defendant is self-inflicted, it is outweighed by the irreparable harm to the party seeking injunctive relief. *See Handel's Enter., Inc.*, 765 Fed. App'x at 125 (upholding the district court's finding that "although Defendants likely would be harmed by an injunction, this self-inflicted harm was the result of Defendants' willful actions and was outweighed").

Gardini testified at the Preliminary Injunction hearing that she reviewed and personally guaranteed the Franchise Agreement and the Restrictive Covenant Agreement in October of 2011. (Transcript, Doc. 25, Pg. ID 397.) Thus, she reviewed the non-compete covenants. (*Id.* at 398.) Additionally, it is undisputed that Defendants have been operating in violation of the Non-Compete Covenant.

Thus, this Court finds the harm to Defendants is self-inflicted and outweighed by

the irreparable harm HHFS would suffer without an injunction. Therefore, the third factor weights in favor of issuing a preliminary injunction.

### IV. Public Interest

The last factor the Court must consider is "whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 551. Defendants argue that the public interest would not be served because CareSmart would no longer able to service approximately two-hundred vulnerable individuals in the community that rely on CareSmart's in-home care services. (Post-Hearing Response in Opp., Doc. 30, Pg. ID 619.) However, the record shows that CareSmart's consumers within the territory would be able to receive the care needed by other in-home care businesses. (Transcript, Doc. 25, Pg. ID 327-329.) Thus, the Court is unpersuaded by Defendants' argument.

Additionally, "[t]he public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." *Handel's Enter., Inc.*, 765 F. App'x at 125. Therefore, the public interest would be served by issuance of a preliminary injunction and the fourth factor weighs in favor of granting an injunction.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for a Preliminary Injunction and **ORDERS** the following:

1. Defendants are **ENJOINED** from continuing to violate the post-termination non-compete covenant under the parties' Franchise Agreement, the Personal Guaranty, and the Restrictive Covenant Agreement.

2. If Defendants have not already done so, Defendants are **ORDERED** to comply with their post-termination obligation to notify all telephone directory and listing companies of the expiration of their right to use the telephone numbers associated with the franchised business, and authorize the transfer of the telephone number and directory listings to Plaintiff.

3. Defendants are **ORDERED** to file and serve upon Plaintiff's counsel, within ten (10) days after entry of any injunction issued herein, a sworn report setting forth in detail the manner in which they have complied with this Order.

4. In accordance with Federal Rule of Civil Procedure 65(d)(2), this Order binds the following who receive actional notice of it by personal service or otherwise: the parties; the parties' officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with the parties or the parties' officers, agents, servants, employees, and attorneys.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND